*1066 CALLAHAN, Circuit Judge,
dissenting:
I respectfully dissent because I would hold that Burke was in custody. Our decisions have determined “custody” in contexts such as Burke’s by examining two factors: (1) the circumstances of the release, and (2) the extent of the restrictions on the defendant’s freedom. See, e.g., United States v. Baxley, 982 F.2d 1265, 1269 (9th Cir.1992); United States v. Jones, 569 F.2d 499 (9th Cir.1978); see also United States v. Sack, 379 F.3d 1177, 1179 (10th Cir.2004). Here, Burke was afforded supervised release to the Residential Reentry Center (the “RRC”) as part of his sentence. Moreover, the restrictions on his freedom at the RRC “approached those of incarceration.” See Baxley, 982 F.2d at 1269. Accordingly, I would hold that Burke escaped from “custody under or by virtue of any process issued under the laws of the United States by any court, judge, or magistrate judge,” 18 U.S.C. § 751(a), and would affirm.
I. Analysis
A. “Custody” in the Residential Reentry Center Context
The issue presented by this appeal is whether Burke was in “custody” at the RRC as that term is used in 18 U.S.C. § 751(a).[1] The government has the burden of establishing probable cause that a defendant was in “custody” within the meaning of the statute in order for the indictment to survive a motion to dismiss. See United States v. Gowdy, 628 F.3d 1265, 1267 (11th Cir.2010). We have eschewed bright-line rules defining “custody” under § 751(a) and have consistently held that the definition varies “in meaning when used in different contexts.”[2] Baxley, 982 F.2d at 1269 (quoting Brown v. Rison, 895 F.2d 533, 535 (9th Cir.1990)). In the residential reentry center/halfway house context, our case law has developed a definition of “custody” by focusing on the circumstances of the release and the extent of the restrictions on the defendant’s freedom. We have held that custody “need not involve direct physical restraint” and may be “minimal” or “constructive.” United States v. Keller, 912 F.2d 1058, 1059 (9th Cir.1990). Here, the government has established probable cause that Burke was in custody when,' as part of his sentence of supervised release, he was released from prison to the RRC, and that facility imposed substantial restrictions on his freedom.
B. The Circumstances of the Release in Burke’s Case
We have held that a person may be in “custody” for purposes of § 751(a) when released to a halfway house or residential reentry center. In Jones, a convicted inmate was released from prison into a halfway house at the direction of the Attorney General. Jones, 569 F.2d at 500. He then failed to return from a weekend pass. Id. *1067 We concluded that Jones had escaped from custody. Id. at 500-01. In Keller, the defendant was serving a term of probation. Keller, 912 F.2d at 1059. He violated the terms of his probation, which the court then revoked, allowing him two weeks to wind up his affairs and report to his place of confinement. Id. Keller failed to report, and we affirmed his conviction for escape. Id. at 1058-59. We reasoned that indicators of “custody” are whether “[a] person of ordinary intelligence and understanding would know that he was not free to leave” and “that he was in ‘custody under or by virtue of any process issued under the laws of the United States by [a] court, [or] judge.’ (§ 751(a)).” Id. at 1060 (quoting United States v. Peterson, 592 F.2d 1035, 1037 (9th Cir.1979)).
The majority seeks to distinguish Jones on the ground that Jones, unlike Burke, was placed in a halfway house “by designation of the Attorney General.” Maj. Op. at 1065. But this distinction has little legal significance. The statute defines “custody” as including “custody under or by virtue of any process issued under the laws of the United States by any court, judge, or magistrate judge.” 18 U.S.C. § 751(a). While Burke may have completed his prison term, he had not completed the sentence ordered by the court, which included a period of supervised release to the RRC, and his freedom remained restricted.
The majority reads our opinion in Baxley as modifying our rulings in Jones and Keller. Maj. Op. at 1064-65. However, Baxley turned on the fact that the defendant was released pending trial on a personal recognizance bond with a special condition that he reside at a halfway house. Baxley, 982 F.2d at 1266-67. In concluding that Baxley was not “in custody” for purposes of conviction under the escape statute, we emphasized that Baxley was an unconvicted criminal defendant on a pretrial release: “Baxley was assigned to the Clark Center not as part of his sentence after trial, but pursuant to the conditions of a personal recognizance bond.” Id. at 1269. Although Jones does not state that Jones was on supervised release as Burke was, it does say that after Jones’s commitment to prison, he “was released to a contract ‘half-way house.’ ” Jones, 569 F.2d at 500. Thus, in Baxley, we found Jones distinguishable precisely because it “involved post-incarceration release to a halfway house.” Baxley, 982 F.2d at 1269 n. 8.
Furthermore, in Baxley, we recognized that there are different fundamental concerns that arise on a pre-trial personal recognizance release, where the aim is to ensure that an unconvicted defendant appears for trial, as contrasted with a situation where a convicted inmate is assigned to a halfway house as part of his sentence of supervised release. See Baxley, 982 F.2d at 1269. Here, Burke was on supervised release that was part of his sentence, rather than a pre-trial recognizance release as in Baxley. Thus, Burke’s release from the Bureau of Prisons did not constitute a release from custody as directed by the district court, and he was still in “custody” under § 751(a).
C. The Extent of the Restrictions on Burke’s Freedom
We have long held that the touchstone of whether a defendant is in custody is whether he should have reasonably understood that he was not “free to leave.” Keller, 912 F.2d 1058, 1060. Here, Burke could not have reasonably felt “free to leave” and not return at the appointed time. The RRC expressly warned him that he could not come and go from the facility as he pleased and that he would be placed on “escape or abscond status” if he left without permission or failed to timely return. Among numerous other restrictions placed on Burke were that all re *1068 quested absences from the RRC required advance approval and had to be for narrowly permitted purposes. The RRC imposed restrictions such as bed assignments, eating and cleaning protocol, daily activities, job assignments at the residence, limitations on phone calls, limitations on personal property, and limitations on visitors. Moreover, the residents’ living quarters were subject to random searches for contraband. Residents at the RRC could not have phones or pagers without permission and even then, only for employment purposes, and residents were subject to random and scheduled urinary and breathalyser tests as well as pat-down searches. Other than the fact that Burke could — occasionally and under very narrow circumstances — leave the RRC, the restrictions are quite different from probation and approached those of incarceration.
The importance of the extent of the restrictions on a defendant’s perceived freedom is illustrated by Baxley and Person. See Baxley, 982 F.2d at 1269; United States v. Person, 223 F.Supp. 982 (S.D.Cal.1963) (holding that a parolee living at a halfway house who could come and go each day was not sufficiently restricted to be in “custody” for purposes of the escape statute). In those cases, the defendants had the freedom to generally come and go as they pleased as long as they gave notice to the facility. See Baxley, 982 F.2d at 1269; Person, 223 F.Supp. at 984-86. Both Baxley and Person were reasonably “free to leave” as that phrase is defined in Keller, 912 F.2d at 1060.
In contrast, Burke was expressly warned that he needed advance permission to leave, could do so “for necessary business only,” and would be placed on “escape or abscond status” if he left without permission or failed to timely return to the RRC. Everything about Burke’s daily life was controlled and scheduled. Thus, the restrictions on Burke’s freedom were much more strict than those in Baxley, where the court concluded that “[t]he restrictions on Baxley’s activities were slight” and “[i]n no way did Baxley’s ‘conditions of confinement approaeh[ ] those of incarceration.’” See Baxley, 982 F.2d at 1269 (quoting Grady v. Crabtree, 958 F.2d 874, 875 (9th Cir.1992) (per curiam)).
Finally, the majority’s expansive reading of Baxley is in tension with the opinions of the Sixth and Tenth Circuits. See Sack, 379 F.3d at 1179-80 (holding that Sack was in custody when released to a halfway house where the restrictions at the halfway house were similar to the restrictions at Burke’s RRC); United States v. Swanson, 253 F.3d 1220, 1223-24 (10th Cir.2001) (“Life at a halfway house undoubtedly entails fewer restrictions than life in prison, but one who lives there under court order is not free to come and go at will. In that respect, residence at a halfway house is a form of ‘custody.’ ”); United States v. Rudinsky, 439 F.2d 1074, 1076-77 (6th Cir. 1971) (finding that the defendant was in custody where he was substantially deprived of “freedom of movement and association” while confined at a community treatment center). These decisions are reconcilable with our precedent in Baxley and Jones, but only if we hold in this case that Burke was in “custody.”
Sack is particularly instructive. There, the Tenth Circuit concluded that the defendant was in “custody” within the meaning of the escape statute while residing in a halfway house pursuant to pretrial release because he was there as a result of an order of the district court and his freedom of movement was restricted. Sack, 379 F.3d at 1179-80. Even though Sack involved a pretrial release like that in Baxley, the court found Baxley distinguishable because the Ninth Circuit “focused on whether the specific conditions of residence at a halfway house were sufficiently restrictive to constitute custody” and *1069 thereby concluded that Baxley did not have extensive restrictions on his freedom. Id. at 1180-81. In contrast, the Tenth Circuit concluded in Sack that the district court was in control of Sack’s liberty pending trial, and he was only permitted to leave the halfway house for employment purposes and was not able to come and go as he pleased, as in Baxley. Id. at 1178, 1181-82. Thus, even though Sack was on a pre-trial release, the restrictions on his freedom were sufficiently onerous to constitute “custody.” Id.; see also Swanson, 253 F.3d at 1223-24 (holding that “residence at a halfway house is a form of ‘custody’ ” under the escape statute).
All of these cases from our circuit and our sister circuits can be reconciled through the reasonable application of our two inquiries for determining custody: (1) what are the circumstances of the release, and (2) what are the restrictions on the defendant’s freedom. I would hold that Burke’s court-ordered supervised release to the RRC was custodial under § 751(a) and that the restrictions on his freedom were more analogous to incarceration than probation.
II. CONCLUSION
The record demonstrates that Burke was in custody when he escaped from the RRC. Burke has failed to demonstrate that he reasonably felt free to leave and not return to the RRC. First, Burke was subject to a post-incarceration release, which is distinguishable from a pre-trial release both in purpose and in restraint. Second, Burke was subject to severe restrictions on his freedom at the RRC, approaching those of incarceration. Consequently, Burke’s case falls closer on the spectrum to the cases where courts have found a defendant residing at a halfway house or RRC to be in “custody” than to those that have not. The majority’s reasoning thus unduly expands Baxley and creates an unnecessary circuit split. Because there was at least probable cause that Burke was in custody sufficient to sustain the indictment, I would reverse the district court’s dismissal of the indictment.

. I agree with the majority that we review the court’s order dismissing Burke’s indictment based on its interpretation of the federal statute de novo. See United States v. Gomez-Rodriguez, 96 F.3d 1262, 1264 (9th Cir.1996) (en banc).

. Even though the definition of "custody” is analyzed on a case-by-case basis, the meaning of the word is not ambiguous such that the rule of lenity should apply. "A statute is not ambiguous for purposes of lenity merely because there is a division of judicial authority over its proper construction. The rule of lenity applies only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." Reno v. Koray, 515 U.S. 50, 64-65, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (internal quotation marks and citations omitted). The Ninth Circuit, as well as other federal courts, have successfully determined Congress’s intent in determining "custody” in particular cases. No court has concluded that the word "custody” is too ambiguous to construe in this context.